## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## 1:21 CR 70 MR WCM

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | MEMORANDUM AND |
| ) | RECOMMENDATION |
| KEITH ALLEN MCMAHAN ) | |
| ) | |
| _____ ) | |

This matter is before the Court on Defendant's Motion to Suppress (Doc. 339), which has been referred to the undersigned pursuant to 28 U.S.C. § 636 for the entry of a recommendation.

## I. Relevant Procedural Background

On August 3, 2021, a thirty-eight count Bill of Indictment was filed against twenty-three individuals. Doc. 3. In that document, Defendant Keith Allen McMahan ("Defendant") was charged with one count of engaging in a conspiracy to possess with the intent to distribute methamphetamine and one count of possessing with the intent to distribute a quantity of methamphetamine.

On December 20, 2021, Defendant filed the Motion to Suppress. Doc. 339. On January 2, 2022, the Government filed its response. Doc. 354.

A hearing was conducted on the Motion to Suppress on January 25, 2022.

## II.    Factual Background

"When material facts that affect the resolution of a motion to suppress . . . are in conflict, the appropriate way to resolve the conflict is by holding an evidentiary hearing after which the district court will be in a position to make findings." United States v. Taylor, 13 F.3d 786, 789 (4th Cir. 1994). In doing so, the court determines "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence." United States v. Gualtero, 62 F. Supp. 3d 479, 482 (E.D. Va. 2014) (citing United States v. McKneely, 6 F.3d 1447, 1452-53 (10th Cir. 1993)).

### A.    Evidence Presented

At the hearing, the Government called the following witnesses, all of whom are employed by the Haywood County Sheriff's Department: Detective Jordan Reagan (who is also a full-time task force officer with the Drug Enforcement Agency), Deputy Jason West, Sgt. Nathan Deweese[1], and Sgt. Matthew Trantham. The Government also introduced, without objection, a copy of Deputy West's Speed-Measuring Instrument Operator Certification, a

---

[1] At the time of the events in question, Sgt. Deweese was a senior deputy with the Haywood County Sheriff's Department. Consequently, this Memorandum refers to his previous rank.

2

Record of Radar Instrument Calibration and Accuracy Tests, and video footage from the dashboard camera on Deputy Deweese's patrol vehicle.

Defendant did not offer any evidence.

B.    Factual Findings

Based on the information of record and as presented during the hearing, the undersigned finds the relevant facts to be as follows:

The indictment in this matter resulted from a multiagency investigation that took place over the course of a year, was led by the Drug Enforcement Agency and the Haywood County Sheriff's Office, and focused on suspected methamphetamine trafficking in Haywood County, Buncombe County, and Jackson County as well as in Georgia. The investigation identified Roberto Illerma Ibarra ("Ibarra") as a suspected source of supply in Georgia, others, including Arthur Shane Douville ("Douville")[2], as being suspected wholesalers in North Carolina, and still others, including Defendant, as being suspected traffickers or associates of the wholesalers.

On May 6, 2020, Detective Reagan was contacted by a confidential informant who advised that Douville would be traveling to Georgia in a blue Acura to pick up several ounces of methamphetamine from Ibarra. The

_____

[2] Douville, who is also charged in the multidefendant Bill of Indictment, has made a similar motion to suppress with regard to the subject traffic stop. A separate Memorandum and Recommendation is being issued with regard to that motion based on the evidence and arguments presented during a separate hearing.

informant stated that Douville would be leaving a residence owned by Traci Barnette and Ashley Godbee ("Godbee") (which residence was later identified as 101 Redlands Place in Sylva, North Carolina ("Godbee Residence")), would travel to the Guest Inn in Norcross, Georgia, would meet with Ibarra to purchase 5 ounces of methamphetamine, and would return to the Godbee Residence. The informant also indicated that Douville had picked up money from Godbee to assist with the purchase of the methamphetamine.

Law enforcement had recently observed the blue Acura bearing a temporary tag.

In response to the information from the informant, Detective Reagan and one of his colleagues, Detective Phillips, traveled to the Guest Inn in Norcross, Georgia, arriving there at approximately 1:40 AM on the morning of May 7, 2020. They searched the parking lot of the hotel but did not find a vehicle matching the description of the Acura given by the informant. They then attempted to locate a residence that was known to be associated with Ibarra but were unable to do so and therefore returned to the Guest Inn at approximately 2:05 AM. A subsequent search of the parking lot revealed a blue Acura with a temporary tag and the detectives began surveilling that vehicle.

At approximately 2:30 AM, a red Mustang matching the description of a vehicle owned by Ibarra drove past the hotel at a slow speed. Three local law enforcement vehicles were in the parking lot on an unrelated matter.

At approximately 3:15 AM, the detectives observed Defendant exit the hotel carrying a flashlight, walk toward the blue Acura, enter the vehicle where he "messed around for a couple of minutes," and then return to the hotel.

At approximately 5:45 AM, Defendant exited the hotel, entered the blue Acura, and drove to a convenience store where he met Shauna Conard ("Conard") and Ameretta Revis ("Revis") who were in a black Kia passenger car that had two flat tires. Conard and Revis got into the Acura with Defendant and they returned to the Guest Inn. At that time, the detectives observed the red Mustang back into a parking spot. Defendant, Douville, and Ibarra were subsequently seen "mingling around" the parking lot.

At approximately 6:30 AM, the red Mustang pulled out of the parking lot. A couple of minutes thereafter, the blue Acura also left the parking lot. The detectives remained in place and, after approximately 20 minutes, observed the Mustang return, followed a few minutes later by the blue Acura.

At approximately 7 AM, a male – identified as "Bo" – was seen walking around the parking lot with Defendant, Douville, and Ibarra. A female, Divette Furman ("Furman"), also appeared. Furman is the mother of another defendant, Ryan Muster. Furman and "Bo" entered a red Toyota vehicle and left.

At approximately 7:25 AM, Defendant, Douville, Revis, and Conard entered the blue Acura and left the parking lot of the hotel. Detective Reagan

5

and Detective Phillips attempted to follow but lost the car in the morning traffic.

Detective Reagan then contacted the confidential informant who advised that Douville was on his way back to North Carolina and that the group was leaving the black Kia vehicle in Georgia. Detective Reagan and Detective Phillips then left Georgia and later returned to the Godbee Residence. When they arrived, they began conducting surveillance on the property and observed Douville, Defendant, Revis, Conard, Godbee, and an unknown black male walking around in the yard. At approximately 1:45 PM, Douville, Defendant, Revis, and Conard left the Godbee Residence in the blue Acura.

Detective Reagan was in contact with Deputy Deweese and Sgt. Trantham, both of whom had previously been involved in other stops during the course of the investigation, and advised them of the events that had transpired, including that Douville was suspected of transporting a multi-ounce quantity of methamphetamine from Georgia to North Carolina in the blue Acura.

Law enforcement personnel then took up positions beside Highway 23/74 inside Haywood County. Detective Reagan kept the officers updated with information such as when the vehicle would be passing their location.

Deputy West, who was in his patrol vehicle and parked beside the eastbound lane of Highway 23/74, was the first to encounter the blue Acura.

6

He personally estimated the vehicle was traveling at 65 miles per hour in a 55 miles per hour speed zone and confirmed his estimate using his radar equipment, which also indicated the Acura was travelling at 65 miles per hour. Deputy West testified that this process of estimating a vehicle's speed and then confirming it through the use of radar is required by North Carolina state law and is his usual practice. Deputy West further testified that he calibrated the radar unit in his patrol vehicle at the beginning of his shift on May 7, 2020 and encountered no issues relating to its accuracy. He recalibrated the machine either at the end of his shift that day or at the beginning of his shift the following day and likewise did not encounter any accuracy issues. Deputy West also stated that the tuning forks he used to calibrate the instrument were issued with the radar unit itself and were specifically provided for that instrument. In addition, Deputy West, at the time of the traffic stop in question, was certified to operate the radar unit, which had been calibrated and tested for accuracy in accordance with North Carolina standards.

Deputy Deweese, whose patrol vehicle was parked near eastbound Highway 23/74 a short distance away from Deputy West, encountered the blue Acura shortly thereafter. He began pursuit and conducted a traffic stop of the vehicle. Other law enforcement personnel were also in the area and several officers appeared at the scene soon after the Acura came to a stop, including Sgt. (now Lt..) Mease, Deputy West, Sgt. Trantham, Detective Reagan, and

7

Detective Phillips. The video from Deputy Deweese's dashboard camera captured the ensuing interactions between law enforcement personnel and the occupants of the blue Acura.[3]

Douville was in the driver's seat, Revis was in the front passenger seat, Defendant was in the back seat behind Revis, and Conard was in the back seat behind Douville.

Before exiting his patrol vehicle, Deputy Deweese called in the temporary tag to dispatch. He then approached the Acura on foot and initially identified Douville, Revis, and Defendant. He knew these individuals from previous encounters and knew that they had been involved in drug related activity. Deputy Deweese noted that Douville was nervous to the point that he could hardly carry on a conversation and that his hands were shaking so violently that Douville could hardly retrieve his license from his wallet. Such a response was not normal for Douville and led Deputy Deweese to suspect he was involved in criminal activity.

Sgt. Mease, who had approached the vehicle from the passenger side, signaled Deputy Deweese that Conard was asleep in the back seat and she was awakened and also identified.

---

[3] Because the video system in Deputy Deweese's patrol car recorded events that occurred prior to the activation of the vehicle's lights or sirens, the video footage begins before Deputy Deweese actually observed the blue Acura. The stop itself commences approximately two minutes after the recording begins.

Deputy Deweese then returned to his patrol car where he began running warrant checks on the occupants through the CJLEADS system. Sgt. Trantham, a K-9 handler who was also on the scene, was interacting with the occupants of the vehicle, including obtaining paperwork for the vehicle from Douville. Sgt. Trantham noted that Douville was nervous and stuttering and that his hands were shaking terribly. Sgt. Trantham testified that he had interacted with Douville many times during vehicle stops and had never known Douville to act so nervous. Sgt. Trantham also testified that this presentation made him suspicious that methamphetamine was contained in the vehicle.

Deputy Deweese exited his patrol vehicle, obtained the paperwork for the Acura's temporary registration from Sgt. Trantham, and placed it on Deputy Deweese's patrol car. The paperwork remained in this position while other events were transpiring.

Defendant, who also appeared nervous and was fidgeting and moving around in the backseat, was asked multiple times to keep his hands where they could be seen and away from a baseball bat that was visible in the rear passenger area.

Douville was removed from the vehicle, patted down by Deputy West, and found to have some tattoo needles and something suspicious in his groin area. He was then handcuffed.

The other occupants were likewise removed from the vehicle. In the process, officers noticed that Defendant was holding something in his left hand and was attempting to crush it. Upon Defendant's exit from the vehicle, Deputy Deweese grabbed Defendant's hand and removed the item, which was revealed to be a "clenched-up pack of cigarettes" that contained shards of suspected methamphetamine. Defendant was then handcuffed.

Deputy Deweese returned to his patrol car and provided each of the occupants' names to dispatch. He also had the vehicle identification number for the Acura checked.

During this time and after the occupants and the officers had stepped away from the Acura, Sgt. Trantham retrieved his canine from his vehicle and had the dog conduct an open-air stiff around the Acura. The dog ultimately alerted on the driver's side by sitting down to indicate the possible presence of controlled substances. Sgt. Trantham then opened the door to the Acura and allowed the dog to access the interior of the vehicle.

At approximately 15 minutes after the stop had commenced, dispatch reported that there were no warrants for any of the occupants.

By that time, law enforcement had begun to search the blue Acura. The search ultimately revealed hidden controlled substances.

10

## III. Analysis

"A traffic stop constitutes a seizure under the Fourth Amendment and is subject to review for reasonableness." United States v. Hill, 852 F.3d 377, 381 (4th Cir. 2017) (internal quotation marks omitted).

"Because a traffic stop is more akin to an investigative detention than a custodial arrest, . . . the constitutionality of such a stop" is analyzed "under the two-prong standard enunciated in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)." United States v. Williams, 808 F.3d 238, 245 (4th Cir. 2015). Specifically, courts consider "(1) if the stop was legitimate at its inception, and (2) if the officer's actions during the seizure were reasonably related in scope to the basis for the traffic stop." United States v. Bowman, 884 F.3d 200, 209 (4th Cir. 2018) (internal quotations and citations omitted).

### A. The Basis for the Stop[4]

During the hearing, Defendant argued that law enforcement did not have reasonable suspicion, at any point, to make the initial stop.

In response, the Government contends that it was appropriate for law enforcement to stop the vehicle based upon the occupants' suspected involvement with narcotics trafficking and based on Douville's observed traffic violation.

---

[4] Defendant argues that he has standing to challenge the traffic stop and the Government agrees.

"[I]t is elementary that the authorities are entitled to stop a moving vehicle reasonably suspected of involvement in smuggling contraband, and they may briefly detain and investigate such a vehicle and its occupants." United States v. Singh, 363 F.3d 347, 355 (4th Cir. 2004) (citing United States v. Sharpe, 470 U.S. 675, 687-88 (1985) (holding stop of vehicle and subsequent twenty-minute investigatory detention was reasonable where authorities observed circumstances indicative of drug trafficking).

Law enforcement personnel may also stop a vehicle when they have probable cause to believe that a traffic violation has taken place. Bowman, 884 F.3d at 209 (citing Wren v. U.S., 517 U.S. 806, 810 (1996) (the initial "decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred")).

In this case, in the hours prior to the stop, law enforcement had obtained numerous pieces of information regarding the suspected drug trafficking activities of Douville, who was accompanied by Defendant. It is not necessary, however, in light of other evidence, to determine whether that information – standing alone – was sufficient to create reasonable suspicion to justify the stop.

Specifically, the Government's evidence indicated clearly that Deputy West, a certified radar operator, used an approved and calibrated radar unit in accordance with North Carolina state procedures to clock the blue Acura

traveling at 65 miles per hour in a 55 miles per hour speed zone. This information provided law enforcement with probable cause to stop the vehicle. See United States v. Melendez, 505 Fed.Appx. 233, 235 (4th Cir. 2013) (police had probable cause for a traffic stop when defendant was travelling 76 miles per hour in a 65 miles per hour zone and made an unsafe lane change); United States v. Pankey, No. 3:16cr79, 2016 WL 6647939, at *3 (E.D. Va. Nov. 9, 2016) (stop of vehicle justified by vehicle's speed of 78 miles per hour in a 70 miles per hour zone). The fact that the officers were also interested in searching the vehicle for suspected drugs did not invalidate this authority. See United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011) ("Any ulterior motive a police officer may have for making the traffic stop is irrelevant").

B.    The Extension of the Stop

Defendant next argues that the officers unlawfully extended the stop.

An investigatory stop "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of the stop. Illinois v. Caballes, 543 U.S. 405, 407 (2005).

The instant case presents an initial question of whether the mission of the stop should be considered traffic enforcement or the investigation of potential drug trafficking. On that point, the Government's evidence indicated that the primary goal of the interaction was to further the investigation of the alleged drug conspiracy. Detective Reagan, for example, testified that law

enforcement personnel planned to try to stop the Acura for any violation that was observed, but that he would likely have stopped the Acura even without any observed traffic violations. Further, during the hearing, the Government argued that a stop of this nature is "a hybrid" between a traffic stop and a stop to investigate suspected drug activity.

Nonetheless, as the parties have argued the issues based on the premise that the mission of the stop was to address the traffic violation, and further as the undersigned, as discussed above, finds that the traffic violation authorized the stop, this Memorandum will likewise consider the initial purpose of the stop as being to address the speeding violation.

"A seizure for a traffic violation justifies a police investigation of that violation." Rodriguez v. United States, 575 U.S. 348, 354 (2015). "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. at 355 (internal citations omitted).

"An officer's inquiries into matters unrelated to the justification for the traffic stop…do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Arizona v. Johnson, 555 U.S. 323, 333 (2009); see also United States

v. Palmer, 820 F.3d 640, 649 (4th Cir. 2016) (quoting United States v. Guijon-Ortiz, 660 F.3d 757, 764 (4th Cir. 2011) (internal quotation marks omitted) (an "officer's focus must remain on the bases for the traffic stop, in that the stop must be 'sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure'").

"Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Rodriguez, 575 U.S. at 354; see also Caballes, 543 U.S. at 407 ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission").

A law enforcement officer may prolong a stop beyond its original purpose, but only with additional authorization; "an officer cannot investigate 'a matter outside the scope of the initial stop' unless he receives the motorist's consent or develops reasonable, articulable suspicion of ongoing criminal activity." Palmer, 820 F.3d at 649-50 (citation omitted); Rodriguez, 575 U.S. at 355 (an officer may not conduct unrelated checks "in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual").

> Reasonable suspicion is a "commonsense, nontechnical" standard that relies on the judgment of experienced law enforcement officers, "not legal

technicians." *See Ornelas v. United States,* 517 U.S. 690, 695, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (internal quotation marks omitted). As we recently explained in *United States v. Williams,* the articulated factors supporting reasonable suspicion during a traffic stop "must in their totality serve to eliminate a substantial portion of innocent travelers," and also demonstrate a connection to criminal activity. *See* 808 F.3d 238, 246 (4th Cir.2015) (internal quotation marks omitted).

Id. at 650.

Here, the evidence indicates that final warrant checks on the occupants of the Acura were completed at approximately 15 minutes from the beginning of the stop. The Government's evidence was undisputed that a period of approximately 15 minutes is typical for traffic stops, such as this one, that involve multiple persons and other factors.

Defendant does not appear to challenge this proposition generally but rather argues that the officers did not diligently pursue the purpose of the stop such that it was unlawfully extended.

As the Government states, however, reasonable suspicion to extend the stop developed shortly after the encounter began and before the tasks associated with an ordinary traffic stop were or reasonably could have been completed. Over the preceding hours, law enforcement had received information from a confidential informant regarding Douville's trip to Georgia for the purpose of purchasing methamphetamine and bringing it back to North

16

Carolina. Detective Reagan and Detective Phillips, acting on that information, had traveled to Georgia and observed Douville and Defendant and their interactions with Ibarra, who was a suspected source of supply in Georgia.

Although the Government's evidence indicated that the confidential informant had been charged with drug-related offenses, no evidence was presented that he/she has been found guilty of crimes of moral turpitude or untruthfulness. Further, while Defendant notes, correctly, that Detective Reagan and Detective Phillips did not observe narcotics, drug paraphernalia, or cash transactions of the type typically associated with drug buys, the events seen during their surveillance corroborated and were consistent with much of the information provided by the confidential informant, including the specific hotel and town where Douville was traveling, that Douville would be meeting with Ibarra, that Revis and Conard had joined Douville and Defendant, and that the group was returning to the Godbee Residence. This information was communicated to other law enforcement officers prior to the stop such that the officers, including a canine unit, were waiting for the blue Acura when it entered Haywood County.

This background, coupled with the extreme and unusual nervousness of Douville, which was observed by the officers when they initially began interacting with him, and the officers' knowledge that at least some of the occupants in the vehicle had been involved previously with drug activities,

provided reasonable suspicion for the extension of the stop. See United States v. Jordan, 952 F.3d 160, 166 (4th Cir. 2020) (police officer had reasonable suspicion of drug distribution, and therefore did not violate the Fourth Amendment when he prolonged a traffic stop for 11 minutes to wait for back-up before walking a drug detecting dog around vehicle where federal agents told the officer that defendant was suspected of drug trafficking, that others involved in the same scheme had been found with firearms, that defendant had been identified as a main supplier, that warrants had been issued for defendant's cell phone and truck, and that federal agent had observed defendant's suspicious activities earlier in the day); United States v. Melvin, No. 5:17-CR-00357-FL-1, 2019 WL 2252013 (E.D.N.C. Feb. 15, 2019), recommendation adopted, 2019 WL 1761544 (E.D.N.C. April 22, 2019) (officer had both reasonable suspicion and probable cause to extend a traffic stop to conduct a dog sniff where stopping officer, through the collective knowledge of DEA task force officer, had specific information to believe that defendant was involved in drug trafficking at the time of the stop).

Additional bases for extending the stop developed soon thereafter, including the discovery of suspected methamphetamine on Defendant (discussed below) and a positive alert for the possible presence of narcotics by Sgt. Trantham's canine. See e.g., United States v. Baker, 719 F.3d 313, 319 (4th Cir. 2013) ("Probable cause to search a vehicle exists when 'reasonable

18

officers can conclude that what they see, in light of their experience, supports an objective belief that contraband is in the vehicle.'  This standard is satisfied when a police officer lawfully searches a vehicle's recent occupant and finds contraband on his person") (quoting United States v. Ortiz, 669 F.3d 439, 446 (4th Cir. 2012)); U.S. v. Jeffus, 22 F.3d 554, 557 (4th Cir. 1994) ("Having the trained dog sniff the perimeter of Jeffus' vehicle, which had been lawfully stopped in a public place, did not of itself constitute a search. When the dog 'alerted positive' for the presence of drugs, the officer was given probable cause for the search [of defendant's vehicle] that followed.") (citing United States v. Place, 462 U.S. 696, 707 (1983)).

Further, to the extent the Government's evidence indicated that Deputy Deweese was not—at every moment between the beginning of the stop and the time that the tasks normally associated with a traffic stop were completed— conveying information to dispatch, receiving or waiting on information from dispatch, or running those checks himself through the CJLEADS system, the time he spent away from those tasks was appropriate.

"Traffic stops are especially fraught with danger to police officers so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." Rodriguez, 575 U.S. at 356. In that regard, directing a driver to exit a vehicle is considered a *de minimis* intrusion on the driver's liberty. Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977); see also

<u>United States v. Racer</u>, No. 2:20-CR-00095, 2021 WL 1342536, at *2 (S.D.W. Va. Apr. 9, 2021) ("an officer may order the driver out of the car for safety purposes because officer safety weighs greater than the 'de minimis' additional intrusion of requiring a driver, lawfully stopped, to exit a vehicle") (quoting <u>Rodriguez</u>, 575 U.S. at 356)).

Here, between running the usual traffic stop-related checks, Deputy Deweese was assisting the other officers in removing and securing the other occupants of the vehicle. <u>See</u> <u>Hill</u>, 852 F.3d at 383 ("the holding in <u>Rodriguez</u> does not render unlawful a traffic stop in which there are brief periods unaccounted for, as long as the stop was not prolonged for purposes beyond the mission of the stop, and the officers executed their tasks with reasonable diligence").

### C.    Defendant's Cigarette Pack

Finally, Defendant argues that Deputy Deweese impermissibly removed the cigarette pack containing the suspected methamphetamine from his hand when he exited the Acura.

In response, the Government contends that Deputy Deweese had reasonable suspicion to pat down Defendant or, alternatively, probable cause to perform a search of his person.

"To justify a patdown of the driver or a passenger during a traffic stop… the police must harbor reasonable suspicion that the person subjected to the

frisk is armed and dangerous." <u>Arizona v. Johnson</u>, 555 U.S. 323, 332 (2009); <u>see also United States v. Brooks</u>, 684 Fed. Appx. 229, 232-33 (4th Cir. 2017) (finding reasonable suspicion to frisk defendant based on contributing factors such as he "seemed extremely nervous," and "the fact that the Infiniti carried multiple occupants bolstered an objective risk of danger"); <u>United States v. Garcia</u>, 496 F.3d 495, 505 (6th Cir. 2007) (concluding that a pat-down was reasonable when "the officers reasonably suspected the [suspects] of drug trafficking"); <u>United States v. Garcia</u>, 459 F.3d 1059, 1064 (10th Cir. 2006) (an individual's involvement with drug transactions or distribution can support reasonable suspicion to frisk that individual for weapons).

In this case, and as discussed above, at the time of the stop, many details provided by a confidential informant who had advised law enforcement that Douville was actively involved in purchasing and transporting a multi-ounce quantity of methamphetamine from Georgia to North Carolina had been verified. Defendant, who was known to have been involved in drug related activities in the past, had accompanied Douville to Georgia and back to North Carolina.

In addition, when encountered by law enforcement who knew them from prior experiences, both Defendant and Douville were observed to be nervous, and Defendant was moving around in the rear of the vehicle and was told not to reach for a baseball bat that was located close by.

21

Further, when Defendant exited the Acura, he appeared to be holding something in his hand. Deputy Deweese testified that, though he could not initially tell what the object was, except that it appeared to be some type of plastic, he believed it was possible that Defendant was holding an object that could be used to injure someone, and that the cigarette pack had to be forcibly removed from Defendant's hand.

The undersigned is persuaded that the information available to Deputy Deweese gave him reasonable suspicion to believe Defendant was armed and dangerous such that the removal of the cigarette pack from Defendant's hand was appropriate. See United States v. Cullars, 272 Fed. Appx 820, 822 (11th Cir. 2008) (finding no clear error in district court's determination that an officer had reasonable suspicion to seize object from a defendant's hand based on the defendant's suspicious movements, response to the officer's questions regarding the object in his hand, and the officer's belief that the object in defendant's hand could be a weapon).[5]

---

[5] "Probable cause exists when 'the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.'" United States v. Patiutka, 804 F.3d 684, 690 (4th Cir. 2015) (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)). Because Deputy Deweese had reasonable suspicion sufficient to support the removal of the cigarette pack from Defendant's hand, the undersigned does not reach the question of whether probable cause to search Defendant also existed.

## IV.    Recommendation

Based on the foregoing, the undersigned respectfully **RECOMMENDS**

that Defendant's Motion to Suppress (Doc. 339) be **DENIED**.

Signed: February 16, 2022

W. Carleton Metcalf
United States Magistrate Judge

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(B), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See Thomas v. Arn, 474 U.S. 140 (1985).